## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Bruce Meskill, as Trustee for the heirs
and next-of-kin of Howard V. Meskill,

                    Plaintiff,

v.

GGNSC Stillwater Greeley LLC d/b/a
Golden Living Center Greeley,

                    Defendant.

Civ. No. 12-851 (RHK/JJG)
**MEMORANDUM OPINION
AND ORDER**

Robert Bennett, Jeffrey S. Storms, Andrew J. Noel, Gaskins, Bennett, Birrell, Schupp, LLP, Minneapolis, Minnesota, for Plaintiff.

Alana K. Bassin, Molly J. Given, Shane V. Bohnen, Bowman and Brooke LLP, Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

In July 2009, Minnesota's Attorney General commenced an action against the National Arbitration Forum (the "NAF"), a third-party arbitration service, alleging that it was biased and had violated several Minnesota laws while handling consumer arbitration claims. See, e.g., CompuCredit Corp. v. Greenwood, __ U.S. __, 132 S. Ct. 665, 677 n.2 (2012) (Ginsburg, J., dissenting). A short time later, the NAF entered into a consent decree and agreed to stop handling such claims. Left in the wake, however, were hundreds of contracts containing clauses mandating arbitration before the NAF or

invoking its rules and procedures.  Courts have struggled to interpret those contracts since the NAF's exit from the consumer-arbitration business.

One such contract is at issue in this case.  Plaintiff Bruce Meskill, as trustee of the estate of Howard Meskill (his father), commenced this action against Defendant GGNSC Stillwater Greeley LLC d/b/a Golden Living Center – Greeley ("GLC"), a skilled-nursing facility in Stillwater, Minnesota, where the elder Meskill had lived, asserting that it was negligent in the care it had provided.  Relying on an arbitration agreement in the documents Meskill signed when he arrived at the facility, GLC now moves to compel arbitration.  For the reasons set forth below, its Motion will be granted.

## BACKGROUND

On September 9, 2009, 83-year-old Howard Meskill was admitted to GLC as a patient.  (Compl. ¶¶ 16-17.)  At that time, he signed both an "Admission Agreement" and a "Resident and Facility Arbitration Agreement" (the "Arbitration Agreement"). (Bohnen Aff. Exs. A, C.)[1]  The Arbitration Agreement provided, in pertinent part:

> It is understood and agreed by [GLC] and [Meskill] that any and all claims, disputes, and controversies (hereafter collectively referred to as a "claim" or collectively as "claims") arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by [GLC] to [Meskill] shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the Parties, or in the absence of such an agreement, at the [nursing home], in accordance with the National Arbitration Forum Code of Procedure, which is hereby incorporated into this Agreement, and not by a lawsuit or resort to court process.  This agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16.

---

[1] To be precise, the agreements were signed by Bruce Meskill, who had power of attorney to act on his father's behalf.

This agreement to arbitrate includes, but is not limited to, any claim for payment, nonpayment, or refund for services rendered to [Meskill] by the [GLC], violations of any right granted to [Meskill] by law or by the Admission Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice, or claims based on any departure from accepted medical or health care or safety standards, as well as any and all claims for equitable relief or claims based on contract, tort, statute, warranty, or any alleged breach, default, negligence, wantonness, fraud, misrepresentation, suppression of fact, or inducement. . . .

In the event a court having jurisdiction finds any portion of this agreement unenforceable, that portion shall not be effective and the remainder of the agreement shall remain effective. . . .

It is the intention of the parties to this Arbitration Agreement that it shall inure to the benefit of and bind the parties, their successors, and assigns, including without limitation the agents, employees and servants of [GLC], and all persons whose claim is derived through or on behalf of the [Meskill], including any parent, spouse, sibling, child, guardian, executor, legal representative, administrator, or heir of [Meskill].  The parties further intend that this agreement is to survive the lives or existence of the parties hereto. . . .

**THE PARTIES UNDERSTAND AND AGREE THAT THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES, AND THAT BY ENTERING INTO THIS ARBITRATION AGREEMENT, THE PARTIES ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY, AS WELL AS ANY APPEAL FROM A DECISION OR AWARD OF DAMAGES.**

(Bohnen Aff. Ex. C (emphasis in original).)

According to the Complaint, as a result of GLC's negligence, Howard Meskill fell down numerous times between September 9, 2009 (the date of his admission to GLC) and January 25, 2010.  (Compl. ¶¶ 17-35.)  The last fall caused him to strike the floor with his head, resulting in a laceration, neck pain, and difficulty moving his right arm.

(<u>Id.</u> ¶ 34.)  It was later revealed that he had suffered vertebral fractures from that fall.

(<u>Id.</u>)  Three days later, he died as a result of those fractures.  (<u>Id.</u> ¶ 36.)

On April 4, 2012, Bruce Meskill commenced this action against GLC, seeking

damages for the alleged negligence.  Clearly anticipating that GLC would invoke the

Arbitration Agreement, the Complaint alleged that said agreement "is not enforceable

because the [NAF] is not available as a forum."  (<u>Id.</u> ¶ 14.)  GLC now tests the merit of

that assertion and moves to compel arbitration of the instant dispute.

## STANDARD OF REVIEW

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 <u>et seq.</u>, was enacted in 1925 in

response to judicial hostility to arbitration.  <u>CompuCredit</u>, 132 S. Ct. at 668; <u>Green Tree</u>

<u>Fin. Corp.-Ala. v. Randolph</u>, 531 U.S. 79, 89 (2000).  It provides that an arbitration

provision in "a contract evidencing a transaction involving commerce . . . shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract."  9 U.S.C. § 2.  The Act establishes a "liberal federal policy

favoring arbitration agreements."  <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr.</u>

<u>Corp.</u>, 460 U.S. 1, 24 (1983).  Both parties agree that the Arbitration Agreement in this

case is a "contract evidencing a transaction involving commerce" and, hence, is subject to

the FAA.  (<u>See</u> Def. Mem. at 5-7; Mem. in Opp'n at 4-5.)[2]

---

[2] "Commerce" means interstate commerce; that is, the FAA is intended to reach as far as
Congress's Commerce Clause power.  <u>Allied-Bruce Terminix Cos. v. Dobson</u>, 513 U.S. 265,
273-77 (1995).  Notably, Bruce Meskill is a resident of Wisconsin, and GLC is located in
Minnesota.  (<u>See</u> Bohnen Aff. Ex. A.)  Moreover, the Arbitration Agreement itself provides that
it "shall be governed by and interpreted under the Federal Arbitration Act."

Where, as here, a party believes that a lawsuit is subject to arbitration, it may move for an order staying the case and compelling arbitration.  9 U.S.C. § 3.[3]  In deciding whether to grant such a motion, two questions must be answered.  First, is there a valid agreement to arbitrate between the parties?  Second, if such an agreement exists, does the dispute fall within its scope?  E.g., Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc., 516 F.3d 695, 699-700 (8th Cir. 2008).  In answering these questions, doubts about arbitrability must be resolved in favor of arbitration, Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991), and "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration," Green Tree Fin., 531 U.S. at 91 (citations omitted).  Further, the Court (rather than the arbitrator) decides the question of arbitrability unless the parties "clearly and unmistakably" delegated that issue to the arbitrator (which neither party argues here).  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

## ANALYSIS

There is no real dispute that a valid agreement to arbitrate exists between the parties in this case.  Meskill does not argue, for example, that the Arbitration Agreement cannot be enforced against him (since he signed it only on his father's behalf) or that it is unconscionable and, hence, unenforceable, two common arguments against arbitration

---

[3] Motions to compel arbitration "are treated as motions to dismiss for lack of subject-matter jurisdiction," and hence the Court "may consider matters beyond the pleadings in resolving such motions." Jann v. Interplastic Corp., 631 F. Supp. 2d 1161, 1162 n.1 (D. Minn. 2009) (Kyle, J.) (collecting cases), overruled on other grounds by Green v. SuperShuttle Int'l, Inc., 653 F.3d 766, 770 (8th Cir. 2011).

provisions.[4]  Nor is there any dispute that the claims asserted in this action fall within the

Arbitration Agreement's exceptionally broad scope.  The agreement applies to "any and

all claims, disputes, and controversies . . . arising out of, or in connection with, or relating

in any way to . . . any service or health care provided by [GLC] to [Howard Meskill],"

including claims for "negligence, gross negligence, malpractice, or claims based on any

departure from accepted medical or health care or safety standards, as well as any and all

claims . . . based on . . . tort [or] negligence."  Counts 1 and 2 of the Complaint assert

claims for negligence and professional malpractice.  (Compl. ¶¶ 38-47.)  Count 3,

similarly, asserts a vicarious-liability claim against GLC due to the "negligence and

malpractice" of certain of its employees.  (Id. ¶ 52.)

Normally, this would be the beginning and the end of the analysis.  The record is

clear that there is both (1) a valid agreement to arbitrate and (2) a dispute falling within

the scope of that agreement.  See Express Scripts, 516 F.3d at 699-700.  As is often the

case, however, things are not as simple as they might seem.

## I.    The parties' agreement did not mandate arbitration before the NAF

Meskill argues that the Arbitration Agreement cannot be enforced because the

parties "expressly agreed to an *exclusive* arbitration provider" – the NAF – that is no

longer available.  (Mem. in Opp'n at 6 (emphasis added).)[5]  Without that "exclusive"

---

[4] As discussed below, Meskill *does* argue on equitable grounds (unconvincingly) that the
Arbitration Agreement is "void."  (See infra at 16-18.)

[5] The parties agree the NAF is unavailable to hear the claims in this case.  (See also Storms Aff.
Ex. B, ¶ 2 (agreeing that the NAF would no longer handle "any arbitration involving a dispute

arbitrator to resolve the instant dispute, Meskill contends it would be improper to compel arbitration.  Stated differently, the issue is "whether the unavailability of [the] NAF as arbitrator dooms the arbitration clause."  Carideo v. Dell, Inc., No. C06-1772, 2009 WL 3485933, at *3 (W.D. Wash. Oct. 26, 2009).  This question has vexed courts across the country and resulted in a substantial split of authority.  In this Court's view, the NAF's unavailability does not preclude arbitration.

The Court's analysis begins, as it must, with the text of the Arbitration Agreement.  After all, arbitration is simply a creature of contract, First Options, 514 U.S. at 943, and hence the ultimate goal when deciding whether to enforce an arbitration agreement is to divine the parties' intent, Boise Cascade Corp. v. Paper Allied-Indus., Chem. & Energy Workers, 309 F.3d 1075, 1081-82 (8th Cir. 2002), bearing in mind the "healthy regard for the federal policy favoring arbitration," Moses H. Cone, 460 U.S. at 24.

The agreement here provides that disputes will be submitted to arbitration "in accordance with the National Arbitration Forum Code of Procedure."  On its face, this provision does not mandate that the NAF actually *conduct* the arbitration – it requires only that the NAF Code be *applied* by the arbitrator.  Cf. In re Salomon Inc. Shareholders' Derivative Litig., 68 F.3d 554, 557 (2d Cir. 1995) (affirming order denying motion to compel arbitration where arbitration clause provided that "all disputes were to be arbitrated by the NYSE and *only* the NYSE," since the NYSE had declined to arbitrate the dispute) (emphasis added); Carideo, 2009 WL 3485933, at *1 n.2 (refusing to enforce

---

between a business entity and a private individual which relates to goods, services, or property of any kind allegedly provided by any business entity to the individual").)

arbitration clause providing that any claim against the defendant "shall be resolved exclusively and finally by binding arbitration *administered by the National Arbitration Forum*," since the NAF was not available) (emphasis added).  Indeed, Meskill acknowledges that the agreement "does not expressly state that the case must be arbitrated before the NAF."  (Mem. in Opp'n at 3.)  And several courts have recognized that when an arbitration clause selects an arbitral forum's rules but does not expressly designate that forum to hear the matter, arbitration may be compelled notwithstanding the forum's unavailability.  See, e.g., Reddam v. KPMG LLP., 457 F.3d 1054, 1059-61 (9th Cir. 2006), abrogated on other grounds by Atl. Nat'l Trust LLC v. Mt. Hawley Ins. Co., 621 F.3d 931 (9th Cir. 2010); Jones v. GGNSC Pierre LLC, 684 F. Supp. 2d 1161, 1167 (D.S.D. 2010) (compelling arbitration under the same agreement as in this case, and noting that the arbitration clause "does not mandate the NAF per se").[6]

Perhaps appreciating this fact, Meskill argues that "agreeing to use the [NAF] Code is the same as agreeing to arbitrate before [the] NAF," because the Code provides, among other things, that it "shall be administered only by the" NAF.  (Mem. in Opp'n at 6.)  Some courts have accepted this argument.  See, e.g., Klima v. Evangelical Lutheran Good Samaritan Soc'y, No. 10-cv-1390, 2011 WL 5412216, at *4 (D. Kan. Nov. 8, 2011) ("The NAF Code . . . states that . . . any arbitration using its rules and procedures 'shall be administered only by [the NAF] or by any entity or individual providing administrative services by agreement with the [NAF].' . . . [T]he fact that the rules are

---

[6] See also Branch v. Sickert, No. 2:10-CV-128, 2011 WL 796783, at *4-5 (N.D. Ga. Feb. 28, 2011); Brown v. Delfre, __ N.E.2d __, 2012 WL 1066210, at *5-6 (Ill. App. Ct. 2012); Wright v. GGNSC Holdings LLC, 808 N.W.2d 114, 121 (S.D. 2011).

restricted for use only by [the] NAF or entities and individuals providing arbitral services by agreement with the NAF suggests that in explicitly selecting the NAF Code . . ., the parties exclusively selected the NAF to administer those procedures."); GGNSC Tylertown, LLC v. Dillon, __ So. 3d __, 2011 WL 3065415, at *2-3 (Miss. Ct. App. 2011); Stewart v. GGNSC-Canonsburg, L.P., 9 A.3d 215, 220 (Pa. Super. Ct. 2010).

Yet, if the parties had contemplated the NAF would be their exclusive arbitral forum, they could have easily said so – there would be no need for them to do so obliquely by "specify[ing] that the arbitration must be conducted by [the NAF's] rules." Brown v. Delfre, __ N.E.2d __, 2012 WL 1066210, at *5 (Ill. App. Ct. 2012); accord Reddam, 457 F.3d at 1059 (arbitration clause requiring application of NASD rules did "*not* state that the arbitration is to take place before the NASD itself" and "[h]ad [that] been intended, the parties could easily have said so") (emphasis in original).  Indeed, by invoking only the Code and not the NAF itself, the agreement suggests that the parties anticipated an entity *other than* the NAF might conduct the arbitration.  Contrary to Klima and similar cases, therefore, some courts have determined "the mere fact [that] parties . . . specify [a particular arbitration forum's] rules to be applied does not, standing alone," mean that they have implicitly designated that forum to arbitrate the dispute.  Carr v. Gateway, Inc., 944 N.E.2d 327, 335 (Ill. 2011); accord, e.g., Clerk v. Cash Cent. of Utah, LLC, Civ. A. No. 09-4964, 2011 WL 3739549, at *5-6 (E.D. Pa. Aug. 25, 2011) (clause requiring "arbitration by and under the Code of Process of the" NAF did not mandate NAF actually conduct the arbitration); Fellerman v. Am. Retirement Corp., No. 03:09-CV-803, 2010 WL 1780406, at *5 (E.D. Va. May 3, 2010) (selection of AAA rules

did not implicitly select AAA as arbitrator).  This Court reaches the same conclusion and

determines "that the [A]rbitration [Agreement] selected only the rules to be applied in the

event of an arbitration, *not* the arbitral forum that would conduct the arbitration."  Delfre,

2012 WL 1066210, at *6 (emphasis in original).[7]

Furthermore, the Court has reviewed the portions of the NAF Code submitted by

Meskill (see Storms Aff. Ex. C) and finds nothing therein so unique to suggest that, by

selecting that Code, the parties implicitly designated the NAF due to some particular

expertise it held.  The South Dakota Supreme Court reached the same conclusion in

Wright v. GGNSC Holdings LLC, 808 N.W.2d 114 (S.D. 2011), a case construing the

identical arbitration agreement at issue here.  There, as here, the plaintiff had argued that

the agreement's designation of the NAF Code was an implicit selection of the NAF

because, among other things, the Code provided it was to be administered by the NAF

alone.  The trial court adopted that view, but the South Dakota Supreme Court disagreed:

> We acknowledge that the NAF rules did provide that only the NAF could
> "administer" its Code of Procedure.  But we find that point of little
> significance.  A review of the NAF Code reflects that NAF administration
> involved what is commonly provided by many arbitration services available
> today.  More importantly, Wright has not identified any unique NAF
> administrative provision that would have substantively affected the
> outcome of this arbitration.  The NAF Code did not require the application
> of any particular substantive law.  It required that the arbitrator apply the
> "applicable substantive law."
>
> Procedurally, the NAF's responsibility to administer its Code is of
> even less significance. . . . [B]oth Wright's and GGNSC's [cited]
> authorities recognize that although a substitute arbitrator may not

---

[7] This conclusion is bolstered by the fact the NAF Code provides (1) arbitrators may be selected
"on mutually agreeable terms" by the parties and (2) the parties may "agree to other procedures"
beyond the Code.  (Bohnen Aff. Ex. C, Rules 1(A), 21(A)(1).)

administer the NAF Code, a competent substitute arbitrator can apply the NAF's rules of procedure that public codes cover.

We conclude that designation of the NAF Code of Procedure did not require an "NAF arbitrator"; a substitute arbitrator could apply common procedural rules like those found in the NAF Code of Procedure and public domain; and a substitute arbitrator would be required to apply the same substantive law. Therefore, the parties' contractual expectations regarding both the substantive and procedural aspects of arbitration would not be frustrated by [requiring arbitration].

Wright, 808 N.W.2d at 120-21 (citations omitted); accord, e.g., Levy v. Cain, Watters & Assocs., P.L.L.C., No. 2:09-cv-723, 2010 WL 271300, at *6 (S.D. Ohio Jan. 15, 2010) (finding "no apparent reasons why the NAF rules cannot be applied by a substitute arbitrator"); Adler v. Dell Inc., No. 08-cv-13170, 2009 WL 4580739, at *3 (E.D. Mich. Dec. 3, 2009) (same); Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 742 F. Supp. 1359, 1362-65 (N.D. Ill. 1990). This Court agrees and rejects Meskill's argument that "agreeing to use the [NAF] Code is the same as agreeing to arbitrate before [the] NAF." (Mem. in Opp'n at 6.)

## II.  Had the parties' agreement required arbitration before the NAF, the Court would nevertheless compel arbitration

In any event, even if Meskill were correct that the Arbitration Agreement implicitly mandated arbitration before the NAF, that forum's unavailability would not compel the denial of GLC's Motion. The FAA contemplates the possibility that a designated arbitrator might be unable to hear a dispute:

If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or *if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of*

> *either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire*, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein.

9 U.S.C. § 5 (emphasis added); accord, e.g., Khan v. Dell Inc., 669 F.3d 350, 354 (3rd Cir. 2012) ("[S]ection 5 of the FAA [] provides a mechanism for substituting an arbitrator when the designated arbitrator is unavailable."); Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1222 (11th Cir. 2000) (same).

In deciding whether to invoke Section 5 to appoint a substitute arbitrator, a court must focus on "whether the designation of the arbitrator [in the agreement] was 'integral' to the arbitration provision or was merely an ancillary consideration." Khan, 669 F.3d at 354 (citing Reddam, 457 F.3d at 1061, and Brown, 211 F.3d at 1222).[8] Again, this is because arbitration is a matter of contract. If designation of a specific arbitral forum was of great import to the parties and that forum later turns out to be unavailable, the Court should not rewrite their agreement and order arbitration someplace else. In such a situation, it is as though an essential term of the agreement has failed. See Rivera v. Am.

---

[8] GLC contends that the Court should look to *state* law when answering this question, but the Court disagrees. The FAA "creates substantive federal law regarding the enforceability of arbitration agreements," Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630 (2009), and hence any question about arbitrability (and, accordingly, the appointment of a substitute arbitrator) must be resolved under federal law. See Khan, 669 F.3d at 353-54 ("[W]e must determine whether the provision . . . that the NAF be the arbitrator . . . is an integral part of the [parties'] agreement . . ., thus preventing the appointment of a substitute arbitrator. *Because this is a question of arbitrability, it is governed by the FAA*.") (emphasis added); Goldstein v. Haw. Med. Serv. Ass'n, 297 F. Supp. 2d 1259, 1263 (D. Haw. 2003) ("Federal law governs questions regarding the . . . enforceability and interpretation of arbitration clauses that come within the scope of the FAA."). Moreover, the Arbitration Agreement expressly provides that it is to be "governed by and interpreted under" the FAA. See Dominium Austin Partners, LLC v. Emerson, 248 F.3d 720, 729 n.9 (8th Cir. 2001) ("The construction of an agreement to arbitrate is governed by the FAA unless the agreement expressly provides that state law should govern.").

Gen. Fin. Servs., Inc., 259 P.3d 803, 812 (N.M. 2011) ("If the plain language of a contract evidences the parties' intention to resolve disputes solely through a specific arbitration provider, the parties' intent would be frustrated if a court appointed a different arbitration provider.").  But that is not the case here; the Court has little trouble concluding the (so-called) "exclusive" designation of the NAF was *not* integral to the Arbitration Agreement.

Whether a designated arbitrator is integral turns on the "essence" of the parties' contract.  Ranzy v. Extra Cash of Tex., Inc., Civ. A. No. H-09-3334, 2010 WL 936471, at *5 (S.D. Tex. Mar. 11, 2010) (citation omitted), aff'd, 393 F. App'x 174 (5th Cir. 2010) (*per curiam*); Singleton v. Grade A Mkt., Inc., 607 F. Supp. 2d 333, 341 (D. Conn. 2009); Zechman, 742 F. Supp. at 1364.  Stated differently, the court "must review the agreement to determine whether the overarching purpose was to submit to arbitration or whether the chosen arbitral forum was as important a consideration as the agreement to arbitrate itself."  Delfre, 2012 WL 1066210, at *6; accord, e.g., In re Salomon, 68 F.3d at 561 (noting the question is whether the parties "intended to arbitrate generally, rather than only if a certain forum was available").  Several factors support the Court's conclusion that the primary concern of the parties here was arbitration, not arbitration *in front of the NAF*.

First, Meskill has offered no evidence that the "exclusive" designation of the NAF was an important consideration to either him or GLC.  Indeed, there is nothing in the record indicating that Meskill was even aware of the NAF (or its Code) when he signed the Arbitration Agreement.  See Gar Energy & Assocs., Inc. v. Ivanhoe Energy Inc., No.

1:11CV-00907, 2011 WL 6780927, at *9 (E.D. Cal. Dec. 27, 2011); <u>Jones</u>, 684 F. Supp. 2d at 1168.[9]

Second, as Meskill's counsel acknowledged at oral argument, the broad scope of the Arbitration Agreement strongly suggests that the parties' "overarching purpose" was to submit to arbitration any disputes that might arise between them.  <u>Delfre</u>, 2012 WL 1066210, at *6.  Indeed, the NAF is mentioned only once in the agreement.  <u>See</u> <u>Diversicare Leasing Corp. v. Nowlin</u>, No. 11-CV-1037, 2011 WL 5827208, at *6 (W.D. Ark. Nov. 18, 2011) ("lack of focus" on the NAF due to it being mentioned only once in three-page arbitration agreement "evidence[s] that the NAF was not a primary concern of the parties").  Notably, the agreement highlighted – in boldface type and capital letters – that the parties were agreeing to arbitrate their disputes, but only the fact of arbitration, not the NAF, is mentioned in this highlighted text.  <u>Cf.</u> <u>Rivera</u>, 259 P.3d at 815 (selection of NAF was integral to arbitration agreement due to "pervasive references to the NAF in the contract").[10]

Third, the Arbitration Agreement includes a clause permitting severance of any portion later found unenforceable.  "The severance provision indicates that the intention was not to make the NAF integral, but rather [only] to have a dispute resolution process through arbitration."  <u>Jones</u>, 684 F. Supp. 2d at 1167; <u>accord, e.g.</u>, <u>Diversicare</u>, 2011 WL 5827208, at *6; <u>Levy</u>, 2010 WL 271300, at *6; <u>see also</u> <u>Parilla v. IAP Worldwide Servs.</u>,

---

[9] As noted above, Meskill bears the burden of proving that his claims are not arbitrable. <u>Green Tree Fin.</u>, 531 U.S. at 91.

[10] Meskill incorrectly argues that the NAF is referenced "throughout the agreement."  (Mem. in Opp'n at 7.)  It is mentioned only once.

VI, Inc., 368 F.3d 269, 288 (3rd Cir. 2004) ("Relevant to the [question] is the presence or absence . . . of a contract provision calling for the severance of invalid provisions.").

Fourth, assuming *arguendo* that the agreement's reference to the NAF Code mandates arbitration before that forum, it does so only implicitly, not explicitly.  "At a minimum, for the selection of an arbitrator to be deemed integral, the arbitration clause must include an *express statement* designating a specific arbitrator."  Carideo, 2009 WL 3485933, at *4 (emphasis added) (internal quotation marks and citation omitted); accord, e.g., Clerk v. First Bank of Del., 735 F. Supp. 2d 170, 180 (E.D. Pa. 2010).  The absence of such an express statement here undermines the conclusion that use of the NAF was integral to the agreement.

Notably, this last fact distinguishes many of the cases cited by Meskill.  For example, in Ranzy, the agreement in question provided for arbitration "*by* and under the Code of Procedure of the National Arbitration Forum."  393 F. App'x at 175 (emphasis added).  Similarly, the arbitration clause in Carideo provided that disputes "shall be resolved exclusively and finally by binding arbitration administered by the" NAF.  2009 WL 3485933, at *1 n.2; see also Carr, 944 N.E.2d at 330 ("You agree that any Dispute between You and Gateway will be resolved exclusively and finally by arbitration administered by the National Arbitration Forum (NAF).").  The mandatory nature of the NAF was far clearer in those agreements than in the Arbitration Agreement here.  And in

the undersigned's view, as in <u>Reddam</u>, "[s]omething more direct is required before we, in effect, annihilate an arbitration agreement."  457 F.3d at 1060.[11]

For the foregoing reasons, the Court concludes that even if Meskill were correct that the Arbitration Agreement mandated arbitration before the NAF, that forum's unavailability simply results in a "lapse" under 9 U.S.C. § 5 that the Court must remedy by appointing a substitute arbitrator.

### III.    The agreement is not void due to unclean hands

Lastly, Meskill argues that the Arbitration Agreement should be voided, as a matter of equity, due to GLC's "unclean hands."  (Mem. in Opp'n at 10-12.)  His argument is two-pronged – first, it would be inequitable to compel arbitration under an agreement presented to him "**after** [the] NAF had already ceased conducting these types of arbitrations," and second, "there can be no doubt that the NAF was [GLC's] arbitration provider of choice," and because the NAF was biased against consumers, the Court should not enforce the agreement.  (<u>Id.</u> at 10-11 (emphasis in original).)  Even assuming the Court enjoys the authority to void the Arbitration Agreement on these grounds,[12] Meskill's arguments are unavailing.

---

[11] Even when an arbitration agreement expressly designates a particular arbitrator, that designation is not necessarily "integral" to the agreement.  <u>Carr</u>, 944 N.E.2d at 335; <u>accord, e.g.</u>, <u>Diversicare</u>, 2011 WL 5827208, at *5.  Otherwise, "section 5 of the [FAA] would not apply in any case where the parties specify an arbitrator that later becomes unwilling or unable to handle the arbitration."  <u>Carr</u>, 944 N.E.2d at 335.  This "would encourage parties to be as vague as possible in drafting their arbitration agreements to guard against a court refusing to apply section 5 . . . in the event the chosen arbitral forum became unavailable."  <u>Id.</u>

[12] Section 2 of the FAA provides that arbitration agreements are valid and enforceable, "save upon such grounds exist at law or in equity for the revocation of any contract."  Meskill has cited no case refusing to enforce an arbitration agreement on grounds similar to those advanced here.

Initially, the Court finds it of no moment that Meskill was presented with the

Arbitration Agreement in September 2009, after the NAF had agreed to stop arbitrating

consumer disputes.  It appears that the agreement is simply a form contract – a conclusion

buttressed by the fact that the same contractual language is found in cases involving other

nursing facilities under the same corporate umbrella as GLC.  See, e.g., Wright, 808

N.W.2d at 115; Jones, 684 F. Supp. 2d at 1163.[13]  Moreover, there is no evidence before

the Court to suggest that, in September 2009, GLC was aware the NAF had agreed not to

hear consumer disputes.[14]  In any event, courts routinely enforce arbitration agreements

entered into after the agreement's designated arbitral forum became unavailable.  E.g.,

Fellerman, 2010 WL 1780406, at *1, 4-5; Estate of Eckstein v. Life Care Ctrs. of Am.,

Inc., 623 F. Supp. 2d 1235, 1237-38 (E.D. Wash. 2009); Stinson v. America's Home

Place, Inc., 108 F. Supp. 2d 1278, 1284-85 (M.D. Ala. 2000); In re Brock Specialty

Servs., Ltd., 286 S.W.3d 649, 654-55 (Tex. App. 2009).  Indeed, this is precisely why

Section 5 of the FAA authorizes the appointment of a substitute arbitrator if, "for any

reason," the designated arbitrator is unavailable to hear the dispute.

Finally, the Court declines the invitation to draw a nefarious conclusion from the

fact that the NAF was GLC's (or its parent company's) "arbitration provider of choice."

---

[13] GLC is one of more than 300 skilled-nursing and assisted-living facilities operated by an entity known as "Golden Living."  See http://www.goldenlivingcenters.com/locations-staff.aspx (last visited May 24, 2012).

[14] Meskill argues that GLC was aware of the NAF's unavailability "in light of [its] participation in the Cole litigation, which was ongoing at the time [the] NAF entered into the Consent Judgment with the State of Minnesota." (Mem. in Opp'n at 11.)  "The Cole litigation" refers to Kevin Cole v. GGNSC Stillwater Greeley LLC, et al., Civ. No. 08-6507 (D. Minn.), a case commenced in this Court in December 2008.  Yet, the docket in that action indicates that it was stayed in favor of arbitration in June 2009, before the consent decree.

But see Khan, 669 F.3d at 358 (Sloviter, J., dissenting) ("It cannot be insignificant that

Dell named NAF as the exclusive forum in its arbitration clauses.").  Indeed, it is

reasonable to conclude that the NAF was specified in the Arbitration Agreement (and all

Golden Living arbitration agreements) simply for nationwide consistency.  Nothing in the

Minnesota Attorney General's action against the NAF implicated GLC, Golden Living,

or any other nursing home.  Because the Court must resolve all doubts in favor of

arbitration, and in the absence of any evidence suggesting an improper motive, the Court

will not invalidate the parties' agreement simply because GLC invoked a "biased"

arbitrator.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED** that GLC's Motion to Compel Arbitration and Stay Proceedings (Doc. No.

6) is **GRANTED**.  This action is **STAYED** pending completion of arbitration.  **IT IS**

**FURTHER ORDERED** that, within 30 days of the date of this Order, the parties shall

either (1) agree on an arbitrator to hear this matter and so advise the Court or (2) jointly

submit a list of proposed arbitrators for appointment, from which the Court will select the

arbitrator.

Date:  May 25, 2012                                    s/Richard H. Kyle
                                                       RICHARD H. KYLE
                                                       United States District Judge